672 So.2d 701 (1996)
Lee H. SCHLESINGER
v.
Mitchell W. HERZOG and the Home Insurance Company.
Lee H. SCHLESINGER
v.
The HOME INSURANCE COMPANY, et al.
Nos. 95-CA-1127, 95-CA-1128.
Court of Appeal of Louisiana, Fourth Circuit.
April 3, 1996.
Rehearing Denied April 24, 1996.
*705 Henry L. Klein, New Orleans, and Bezou & Matthews, Jacques F. Bezou, Mandeville, and Bezou & Matthews, Robert H. Matthews, New Orleans, for Lee H. Schlesinger.
James J. Hautot, Judice, Hill & Adley, Lafayette, for Mitchell W. Herzog.
Michael E. Wanek, Hulse, Nelson & Wanek, New Orleans, for Shushan, Jackson and McPherson.
Raymond J. Salassi, Jr., Thomas A. Casey, Jr. and Katy Kimbell Theriot, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for the Home Insurance Company.
Before BARRY, KLEES and BYRNES, JJ.
BYRNES, Judge.
Defendants, Mitchell W. Herzog, the Home Insurance Company, and Shushan, Meyer & McPherson appeal a trial court judgment awarding plaintiff $5.5 million for legal malpractice. Plaintiff, Lee H. Schlesinger, appealed the refusal of the trial court to tax costs to the defendants. We affirm as amended.
Schlesinger's damages arise out of the merger of his real estate management company, Westminster Management Company, into Westminster Asset Management, which company was controlled by Sidney Lassen. Schlesinger received only a 1% interest in Westminster Management Company. This occurred on April 18, 1990. Concomitant with this merger was to be the "Asset Deal" whereby Lassen was to obtain a 52% interest in valuable commercial real estate properties belonging jointly to Schlesinger and various of his relatives in return for a multi-million dollar infusion of equity by Lassen. Schlesinger was assured by Herzog that in the event the "Asset Deal" were not consummated the merger would be unwound and Schlesinger would recover his management company. The "Asset Deal" fell apart, but Lassen refused to unwind the merger. Schlesinger contends that during the course of the merger and subsequent negotiations concerning the "Asset Deal", Herzog and his firm were representing both his interests and those of Lassen in spite of an obvious conflict of interest.
Schlesinger alleges that his attorney Mitchell Herzog and the law firm of which he was a member at the time of the merger, Shusan, Meyer, and McPherson, committed malpractice and breached their fiduciary duty to him arising out of this conflict of interest. Specifically, the breach consisted in failing to recommend to Schlesinger that he reduce the agreement to unwind the merger to writing so that it would be enforceable; by generally advancing Lassen's interests in preference to his own; and by failing to disclose to Schlesinger the true nature of the risks he ran in acquiescing in the dual representation.
Schlesinger commenced litigation by bringing a securities fraud case against Lassen in federal court. Some aspects of the instant malpractice claim against Herzog were initially included in that suit. Schlesinger amplified the malpractice claims and made them the substance of a second suit against Herzog filed in State court. Herzog succeeded in removing the state court suit to federal court because of the pending securities fraud claim. The federal court later remanded the malpractice claim back to state court finding that it posed no federal question and "was deeply rooted in state law." Subsequently, Schlesinger also filed a separate state court suit for malpractice against the law firm of Shushan, Meyer & McPherson and the firm's malpractice insurer, the Home Insurance Company. Those claims had not been included in the original federal court proceedings. The two state court suits have been consolidated.
The state court proceedings were stayed pending the outcome of the federal court proceedings. Schlesinger was not successful in the federal court proceeding. Following the unsuccessful federal case, judgment was rendered in favor of Schlesinger in the state court proceedings for $5.5 million. Herzog, the firm of Shushan, Jackson & Mcpherson, and The Home Insurance Company were found to be solidarily liable to Schlesinger for *706 those damages, based on a finding by the jury that Schlesinger was not at fault, Herzog was 85% at fault, and Shushan, Jackson and McPherson were 15% at fault.

I. STANDARD OF REVIEW
This case turns on several basic questions of fact:
1. Did Herzog make an adequate explanation to Schlesinger of what the consequences to Schlesinger could be as a result of Herzog's conflict of interest, or did Herzog state only that he had a conflict without explanation?
2. Did Schlesinger have reason to believe that Herzog would warn him of any impending legal peril based on Herzog's actions, representations and/or relationship of many years duration?
3. Was Herzog acting in the solely neutral capacity of scrivener, or did he take positive steps to advance Lassen's interests to the detriment of Schlesinger?
Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880, 883 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. at 882. The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable. Id. Even if the appellate court would have decided differently had it been the original trier of fact, the trial court's judgment should be affirmed unless it is clearly wrong or manifestly erroneous. Welch v. Winn-Dixie Louisiana, Inc., 94-2331 (La. 5/22/95), 655 So.2d 309, 316.

II. THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR BY ADMITTING PREJUDICIAL EVIDENCE OVER DEFENDANTS OBJECTION.
A. The Shushan firm legal bills.
Defendants argue that it was prejudicial error to allow the plaintiff to introduce evidence of the $560,000.00 legal fee the Shushan firm expected to collect upon the consummation of the Asset Deal. Defendants contend that the plaintiff's only motive in introducing such evidence was to inflame the jury's anti-lawyer bias. There is no evidence in the record of such a bias.
The $560,000.00 fee was far in excess of the book value that the defendant's expert placed on Westminster. Evidence of that fee was relevant to rebut the defendants' valuation. Such evidence would legitimately permit the jury to infer that defendant's expert must be underestimating the value of the business.

B. The hypothetical question asked of Professor Morgan, plaintiff's legal expert did not constitute reversible error.
The hypothetical question posed by the plaintiff's attorney to his legal expert, Professor Morgan, when placed in context and read as a whole appears intended to ask the expert to assume that plaintiff was never fully advised of the full import of the conflict situation in which Herzog and his firm found themselves. However, as contended by the plaintiff, the literal language in places goes beyond that and states that Schlesinger was not informed of the existence of the conflict at all. Although this may have been error, it was harmless error. There is no basis for assuming that the jury accepted this question as evidence, and Professor Morgan's response to the question concerning the nature of the conflict contained conclusions that were general in nature untainted by the alleged flawed nature of the hypothetical question, as will be explained hereafter.
Defendants complain of plaintiff's reference in the trial to post merger events as being irrelevant, such as the firing of Mr. Charbonnet in July of 1990. Such facts are relevant to Mr. Lassen's refusal to unwind the merger in September of 1990 which, as will be explained hereafter, is the real source of Mr. Schlesinger's damages. The April 19, 1990 merger date is not the cut-off date for determining relevancy.
*707 The defendants complain that the trial judge transformed an ethical issue into a legal duty. But on the next page of their brief defendants argue that the Louisiana State Bar Association's Rules of Professional Conduct "have the force and effect of substantive law." We agree. Thus the ethical issue was transformed into a legal duty.

III. HERZOG WAS NOT JUST A SCRIVENER
Defendants contend that Herzog was just a "scrivener", in effect a scribe employed for the sole purpose of setting down in writing the terms of the transaction agreed upon by the plaintiff and Lassen, with the expectation by all parties that he would transcribe whatever terms and conditions were agreed to by the parties and that no party expected Herzog to warn of legal pitfalls.
Viewing the record as a whole, we cannot say that the jury was manifestly erroneous in concluding that Herzog's role was more than that of a passive scrivener, akin to a secretary transcribing dictation. The testimony of several credible witnesses described Herzog's role in the transaction as being more than that of a mere scrivener, and Herzog's own testimony permits of such an inference. From David Stone's testimony, the jury could have reasonably inferred that not only was Herzog not acting as a scrivener in these matters, Herzog was actually promoting Lassen's interests.
If the jury's verdict is based on a finding that Herzog was more than just negligent, and that he in fact advanced Lassen's interests to the detriment of Schlesinger, this Court, after reviewing the record as a whole, cannot say that such inferences are manifestly erroneous or clearly wrong, regardless of whether we would have reached the same conclusion.

IV. THE JURY FINDING THAT THE CONDUCT OF HERZOG CAUSED DAMAGES TO SCHLESINGER WAS NOT MANIFESTLY ERRONEOUS.
Viewing the record as a whole we cannot say that the jury was manifestly erroneous in concluding that Herzog had a duty to advise Schlesinger to reduce to writing Lassen's agreement to unwind the merger. Defendants argue that no such agreement ever existed. However, the existence of such an agreement was supported by the testimony of both interested and disinterested witnesses, such as Mr. Michael Little, Mr. Michael Charbonnet, and Mr. Kirk Stirton.

V. THE ADMISSION OF PROFESSOR MORGAN'S EXPERT TESTIMONY DID NOT CONSTITUTE REVERSIBLE ERROR.
Defendants complain that the admission into evidence of the testimony of Professor Morgan as one of plaintiff's experts was reversible error because he was not a Louisiana practitioner. Moreover, the defendants contend that the hypothetical facts upon which Professor Morgan based his opinion were not only incorrect, but were so prejudicially inflammatory to the jury as to constitute reversible error.
A review of the transcript leads this Court to a contrary conclusion. The main conclusions to which Professor Morgan testified were as follows:
Well, if I understand the question, what Mr. Herzog did was Mr. Herzog faced a situation in which obviously Mr. Schlesinger would like to have received something for his company. And Mr. Lassen would prefer to not have paid anything for the company or paid as little as possible. And it appearsCertainly from the facts that I've been asked to assume, it appears here that Mr. Schlesinger got very little indeed for his company.
Second, it was obviously in Mr. Lassen's interest to have as much interest in that new company, that merged company as possible, and Mr. Schlesinger's interest to try to maintain control, at least a very substantial interest in his own company. What I've been asked to assume here and assume the evidence will show is that Mr. Schlesinger wound up with 1 percent. And Mr. Lassen wound up with 99 percent.
It was clearly in Mr. Schlesinger's interest to have documented the fact that this deal was gonna be unwound if the Asset Deal that we've heard about that supposedly *708 was the reason, or one of the main reasons, for this merger to begin with, if it didn't take place. Mr. Schlesinger had an interest in documenting that. Mr. Lassen obviously didn't have an interest in documenting that, because if it were documented, he would have had to give Mr. Schlesinger his business back.
* * * * * *
And the point is that each of those areas where one party wanted one thing and another side wanted another wound up with Mr. Lassen getting the lion's share, if not everything.
These conclusions to which Professor Morgan testified are virtually self-evident. Indeed, such conclusions could be reached through the power of reasoning alone, unaided by the testimony of an expert. Such conclusions are in no way dependent on the locality of the legal practitioner. Professor Morgan's description of the conflict between what was in the plaintiff's interest and what was in Mr. Lassen's interest would be true in any jurisdiction, whether it be one of common law or one of civil law.
We find nothing prejudicial or inflammatory in the above quoted testimony or in the balance of Professor Morgan's testimony. This Court is not so much in need of the assistance of experts to determine the applicable standard of care to be exercised by the legal profession as might be the case were we dealing with a complex medical, technological, or scientific question with which this Court was not generally familiar. In this case the statements made by Professor Morgan were directed to basic fundamental duties. We can find no material error regardless of how much experience Professor Morgan may have had with the practice of law in Louisiana.
This is consistent with Ramp v. St. Paul Fire & Marine Ins. Co., 263 La. 774, 269 So.2d 239 (1972) wherein the court stated that judicial notice of obvious legal negligence could be taken regardless of expert testimony. Defendants cite Houillon v. Powers and Nass, 530 So.2d 680 (La.App. 4 Cir.1988) to the contrary. Houillon has very little persuasive authority as all three judges on the panel filed separate opinions. One of the few things all three judges in Houillon agreed on was that Ramp stands for the proposition that courts are not always in need of expert testimony in legal malpractice cases. Judge Barry's concurrence in Houillon, which expresses this view most strongly in instances of "obvious negligence," represents the weight of authority. Nelson v. Waldrup, 565 So.2d 1078, 1079 (La.App. 4 Cir.1990); Morgan v. Campbell, Campbell & Johnson, 561 So.2d 926 (La.App. 2 Cir.1990).
Where the trial court is familiar with the standards of practice in its community, or where the attorney's conduct obviously falls below any reasonable standard of care, the assistance of expert testimony may be unnecessary. Morgan, 561 So.2d at 929. It was up to the jury to determine what Herzog's acts and omissions were. The jury implicitly found that Herzog's acts and omissions were such that his "conduct obviously falls below any reasonable standard of care," obviating the necessity for expert testimony. This is analogous to the exception to the "locality rule/similar community" requirement in medical malpractice cases where expert testimony is not deemed necessary in cases of obvious negligence such as where the wrong limb is amputated.
Assuming for purposes of argument that expert testimony was necessary, one need look no further than the testimony of Monica Surprenant, defendants' legal expert. Ms. Surprenant was asked this hypothetical question:
So I would ask you to assume in this hypothetical that Lee Schlesinger believed that Mitchell Herzog was representing him in this transaction; okay? Got that one. Number 2, that Mitchell Herzog did in fact tell Lee Schlesinger at the time of the merger in April of 1990this is at the time of the merger, not after the merger, not two days later, not three days later, but at the time of the mergerthat Sidney Lassen would unwind the merger if the Asset Deal fell through.
And number 3, accept that Lee Schlesinger trusted and believed Mitchell Herzog when he told him that. And number 4, that Mitchell subsequently, that is, after *709 the merger, told the same thing to Rader Jackson, to Louis Shushan, to Mike Charbonnet, to Kirk Stirton, to Mike Little.
And finally assume, and I don't think there's any dispute about it in this case, but that Mitchell Herzog did in fact draft those merger documents; correct? And in fact, in this case, the merger documents have no mention of this unwinding aspect, do they?
A. No, they don't.
Q. And assume that fact as well.
A. Sure.
Q. Now assuming all of those factsDo you have them now?
A. I think so.
Q. Do you agree with me that Mitchell Herzog breached his duty to Lee Schlesinger if he allowed Mr. Schlesinger to go through and execute those documents without explaining to him the risk of what would occur if the asset transaction did not go through?
A. Yes, I think he did.
The record, when viewed in its entirety, is replete with evidence from which the jury could reasonably infer that the relationship between the plaintiff, Herzog and Herzog's firm was such that they were not mere onlookers or scribes in this case.
Having determined that the record would support a finding that Herzog and his firm were not mere onlookers or scribes, we must now determine, applying the same manifestly erroneous/clearly wrong standard, whether the record supports the finding that Herzog and the firm of Shushan, Meyer, Jackson and McPherson violated the duty owed to plaintiff arising out of the lawyer-client relationship. After reviewing the record as a whole we cannot say that the finding that the duty was violated was either manifestly erroneous or clearly wrong.
Michael F. Little, an attorney, testified that he represented the First National Bank of Commerce at a meeting on August 1, 1990 at which Herzog said to him that he was representing the Sizeler and plaintiff's interests. Little further testified that Herzog acknowledged the existence of a conflict of interest, but that he stated that it had been resolved. Little also testified that the merger occurred before Herzog resigned his representation of the plaintiff. Herzog told Little unequivocally that if the Asset Deal fell through the merger would be unwound.
Kirk Stirton, C.P.A., said the merger would be unwound if the asset deal did not go through. Charbonnet was present when Herzog told Schlesinger that Lassen would give back the management company if the asset deal did not go through.
The mere disclosure of the existence of a conflict does not relieve an attorney of the duty to warn his client of dangers he may see in his client's path, especially when he should have known his client would expect him to do so. Schlesinger's acceptance of the existence of Herzog's conflict of interest was based on a combination of Schlesinger's faith in and reliance upon Herzog arising out of a relationship of many years along with Schlesinger's failure to appreciate the legal consequences of his acts, consequences to which Herzog had a duty to alert him. It is possible Schlesinger might have exercised greater care to safeguard his interests had he not had such faith and confidence based on their relationship of many years. Under the circumstances Schlesinger's faith and confidence, and his reliance thereon was not unreasonable.
A disclosure of a conflict is not the same as a license to intentionally advance the interests of one party to the known detriment of another. It is customary to expect one's counsel to aggressively assert one's rights in preference to those of another party. However, where an attorney discloses a conflict he does so to let his client know that this may not be a realistic expectation under the circumstances because the attorney may lose his objectivity without intending to do so and without even realizing it. It is a fact of human nature that reminds us of the biblical admonition that man cannot serve two masters. Therefore, a disclosure of a conflict is a warning that the attorney may not pursue his client's interests with the singleness of purpose normally expected. It does not serve as adequate notice to the client that the attorney will actively pursue the ruin of one *710 client for the benefit of another. A waiver by the client of objection to a conflict is not a waiver of that client's right to complain about the intentional infliction of harm by the attorney or the "obvious negligence" of the attorney to prevent such harm. Herzog never disclosed to Schlesinger that he intended to work against him or would fail to warn him of obvious legal danger.

VI. THE DAMAGE AWARD WAS NOT CONTRARY TO THE LAW AND THE EVIDENCE.
On the question of valuation the jury apparently chose to credit the testimony of plaintiff's expert Marc Margulis in preference to the testimony of defendant's expert, Charles Allen. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1111 (La.1990).
Defendant's expert testified that he devoted only 5% of his time to business valuations, while plaintiff's expert testified that he was engaged full time in business valuations and in assisting clients in the buying and selling of companies. Plaintiff's expert testified that he had done well in excess of 500 business valuations. Defendant's expert testified that in the past five years his firm had done 31 business valuations. Plaintiff's expert had been engaged by the Internal Revenue Service, the Securities and Exchange Commission and the Justice Department of the United States to assist in matters pertaining to the valuation of companies. Defendants expert had no comparable experience. Plaintiff's expert has had his work in the field published. Defendant's expert can make no similar claim. Defendant's expert acknowledged that the American Society of Appraisers is the professional association which is specifically geared towards business valuations. (In fact, defendant's expert testified that the co-author of the publication on which he was relying was only a candidate for membership and had not yet completed all of the requirements necessary for membership.) To qualify for membership one must have five years experience, pass a rigorous examination, and submit a series of reports to a review committee. Plaintiff's expert is a member of that association; defendant's expert is not. Therefore, we cannot say that the jury was either manifestly erroneous or clearly wrong when it implicitly accepted the testimony of plaintiff's expert in preference to that of the defendant's expert.
Defendants note that Schlesinger's CPA placed a value of $400,000.00 on WMC prior to the merger. The $400,000.00 figure is book value. Book value need have no relationship to market value. Fair market value may be many times book value.
Defendants contend that the valuation date should be April 19, 1990 when the merger was signed. Plaintiff's expert based his valuation on a date of September 9, 1990 which was the date on which plaintiff's request that the merger be undone was rejected. The damage done to the plaintiff occurred not when the merger was signed, but when the Lassen refused to unwind it. Plaintiff's cause of action did not arise until Lassen refused to unwind the merger and that is the appropriate date for valuation purposes. The date of the act of negligence, assuming that April 19, 1990 is that date, was not necessarily the date on which the damage was done and the cause of action arose:
"The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harmnot yet realizeddoes not suffice to create a delictual action. Rayne State Bank & Trust Co. v. National Union Fire Ins. Co., 483 So.2d 987 (La.1986). Until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice."
It was not error to use September 9 as the valuation date. Therefore, we need not consider defendants arguments concerning the value as of April 19, 1990.
Defendants argue that the September 9, 1990 valuation should have taken into account the threatened Equitable foreclosure. The Equitable foreclosure may have seemed imminent *711 on April 19, 1990, but by September 9 it was no longer a threat.
Defendants argue that Mr. Margulis' valuation was erroneously high because it assumed an occupancy rate of 90% when the actual occupancy rate was only 72%. But defendants failed to note that Mr. Margulis explained that by overestimating occupancy without overestimating rentals he would have, if anything, undervalued the property because he would have underestimated the potential for increased revenue from increased occupancy, e.g., it is more realistic to project a 10% increase in occupancy from 72% to 82% than it would be to project such an increase from 90% to 100%.

VII. The testimony of Professor Hollister did not constitute reversible error.
Defendants assert that the hypothetical question posed to Professor Hollister could not be supported by the facts, and that his opinion that an attorney cannot have a common representation when documenting a transaction is contrary to law:
It is a recognized principle of the law of evidence that if expert testimony given in response to hypothetical questions is predicated on a statement of unproven facts, it has no probative value and should not affect the outcome of the case. Brown v. Aetna Casualty & Surety Co., 96 So.2d 357, 360 (La.App.2d Cir.1957). Although it is the judge's province to rule improper a hypothetical question predicated on facts totally lacking support in the record, an error in this regard is not reversible as long as other evidence fairly proves the matter addressed by the improper hypothetical. Guerra v. W.J. Young Construction Co., Inc., 165 So.2d 882, 887 (La.App. 4th Cir.1964). The jury, whose responsibility it is to determine the facts from the evidence, should decide whether or not the evidence proves the facts upon which the hypothetical was predicated. Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based as well as the professional qualifications and experience of the expert. If the opinion is based upon facts not supported by the record, the opinion must be rejected. Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711, 719 (La. App.2d Cir.1991).
Meany v. Meany, 94-0251 (La. 7/5/94), 639 So.2d 229, 236.
There was nothing in the jury instructions that would have influenced the jury to give any weight to the testimony of Professor Hollister. The record contains sufficient other evidence to permit the jury to conclude that the acts of malpractice alleged by the plaintiff fall into the category of "obvious negligence" such that expert testimony was necessary neither to establish the standard nor the breach thereof. To the extent that Professor Hollister's questioning and testimony may have constituted error, it was not reversible error.
A review of the record as a whole creates the definite impression that the plaintiff introduced the expert testimony more out of an excess of caution in the unlikely event that the court might determine that the nature of the breach if proven did not fall into the category of "obvious negligence", rather than as elements critical to proving his case.
The defendants contend that conflicts may be waivable with consent under Rule 1.7 of the Rules of Professional Conduct, and that Professor Hollister made an incorrect statement of the law when he opined that certain conflicts are not waivable even with consent. Rule 1.7 requires more than consent. It requires that the lawyer reasonably believe that the conflict is not of such a nature that his client's representation will suffer. Professor Hollister gives as an example of an unwaivable conflict a negotiation over price. We infer from this example that what Professor Hollister means is that situations exist in which no lawyer could reasonably ignore the substantial likelihood that "the representation would be adversely affected" regardless of consent, situations that might fall into the category of "obvious negligence" a concept discussed elsewhere in this opinion. Professor Hollister's opinion was at least relevant, reasonable, and worthy of consideration by the jury which was entitled *712 to give it whatever weight it deemed appropriate.

VIII. DEFENDANTS HAVE FAILED TO POINT TO ANY JURY INSTRUCTIONS THAT WOULD CONSTITUTE REVERSIBLE ERROR.
Defendants contend that certain jury instructions constitute reversible error. Defendants contend that the trial court's instruction on fiduciary duty shows that the trial court had already decided that Herzog owed a fiduciary duty to Schlesinger, and instructed the jury accordingly. The jury instruction places the burden of proving the existence of a fiduciary relationship on Schlesinger, and leaves it up to the jury to determine whether in fact such a relationship existed, without suggesting to the jury what that finding should be:
To establish a claim for breach of fiduciary duties, the plaintiff must prove by a preponderance of the evidence that, 1, the defendants are fiduciaries ... [Emphasis added.]
The relationship between an attorney and his client is frequently characterized as a fiduciary relationship. Plaquemines Parish Com. Council v. Delta Development Co., Inc., 502 So.2d 1034, 1040 (La.1987); Soderquist v. Kramer, 595 So.2d 825 (La. App. 2 Cir.1992). The duty imposed on a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interest. Plaquemines Parish, supra; Soderquist, supra.
Defendants also complain of an instruction given on "situations where the attorney's interest is adverse to that of his client ...", because this is not a self-dealing case. Defendants assert that: "Herzog's only official connection with any business entity related to Lassen was Herzog's position as an officer, director and stockholder of SPI, a relationship well known to and accepted by Schlesinger." The fact that this relationship may have been known to Schlesinger does not mean that it can have no bearing on the question of Herzog's loyalties once the jury determined that Herzog's relationship to Schlesinger was that of a fiduciary. Defendants acknowledge that this instruction was a correct statement of the law on self-dealing. Defendants assert that self-dealing was not involved because Schlesinger's management company was merged into Westminster Assets Management, not SPI. SPI was another Lassen company. Herzog owned stock in SPI and was vice-chairman of the board. The jury could and obviously did reasonably infer that because SPI would have ended up in control of the properties involved in the "Asset Deal", and that Herzog suggested terms to Schlesinger for the "Asset Deal" that were increasingly onerous to Schlesinger and increasingly more favorable to Lassen, that Herzog was involved in self-dealing connected with SPI. As the "Asset Deal" and the management deal were supposed to be a package deal, Herzog's self-dealing in connection with SPI cannot be separated from his actions in connection with the merger. From the relationship between the two deals the jury could have reasonably inferred that the benefit that Herzog stood to gain from the overall transaction could have influenced him to intentionally advance Lassen's interests in connection with the merger to the detriment of Schlesinger's, or at least caused him to fail to exercise that minimal level of vigilance required to protect Schlesinger from the failure to reduce the agreement to unwind to writing which constitutes obvious negligence. Additionally or alternatively the jury could have reasonably inferred that in the absence of such a conflict or self-dealing, Herzog could have produced terms for the "Asset Deal" that would have been acceptable to Schlesinger and thereby obviated the necessity for unwinding the merger.
Even if it were to be conceded for purposes of argument that this solely is a conflicts of interest/fiduciary duty case and not a case of self-dealing the burden would still be on the defendants to show that the conflict was disclosed and explained to Schlesinger; that Schlesinger knowingly waived any objection; and that regardless of any waiver Schlesinger may have made, the defendants must show that they did not reasonably believe that the conflict was of such a nature *713 that Schlesinger's representation would suffer. Defendants failed to carry this burden.
Therefore, if there was error, it did not prevent the jury from rendering a just verdict:
The verdict of a jury will not be set aside by reason of an incorrect instruction absent a showing of prejudice such that the jury was misled to such an extent that it was unable to render a just verdict.
* * * * * *
The mere discovery of an error in the trial judge's instructions does not, of itself, justify an appellate court conducting the equivalent of a trial de novo, without first measuring the gravity and degree of the error, and considering the instructions as a whole and the circumstances of the case... In reviewing the record, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and facts.
Drury v. Kitchen, 95-0410 (La. App. 4 Cir. 11/17/94), 645 So.2d 1286, 1288, 1289, writ denied 94-3098 (La. 2/9/95), 649 So.2d 425. An appellate court must exercise great restraint before overturning a jury verdict on a suggestion that jury instructions were so erroneous as to be prejudicial. Billiot v. Estate of Richardson, 94-1794 (La. App. 1 Cir. 5/5/95), 655 So.2d 443, 445. The appellate court should only set aside the jury verdict in those cases where the instruction misled the jury to such an extent as to prevent it from doing justice. Rowsey v. Jones, 26-823 (La.App. 2 Cir. 5/10/95), 655 So.2d 560, 575.
IX. SCHLESINGER'S TESTIMONY WAS NOT SO INCREDIBLE OR INTERNALLY INCONSISTENT AS TO REQUIRE REJECTION BY ANY REASONABLE JUROR
The trier of fact may accept or reject any part of a witness' testimony. [cites omitted] The trier of fact may choose to reject all of the testimony of any witness or may believe and accept any part or parts of a witness' testimony and refuse to accept any other part or parts thereof.
Welch v. Winn-Dixie Louisiana, Inc., 94-2331 (La. 5/22/95), 655 So.2d 309, 317 (1995).
Defendants argue that it was manifest and reversible error for the jury to credit Schlesinger's testimony as they implicitly must have, because it was so implausible and internally inconsistent. Upon closer examination, these alleged inconsistencies disappear or are immaterial. For example, defendants contend that Schlesinger admitted that he and his family were advised by Herzog to obtain separate counsel to represent them in negotiations with Lassen. Schlesinger did not so testify. Schlesinger testified that at the family meeting of March 29, 1990 Herzog informed those present that he had a conflict and that he would not participate in the negotiations. Schlesinger did not say that Herzog advised him to obtain other counsel, and regardless of whether Herzog intended to participate in negotiations as of March 29, 1990, events were to show that he subsequently did participate in those negotiations.
The crux of Schlesinger's case was that Lassen had agreed to unwind the merger if the asset deal did not go through. On that point Schlesinger's testimony was corroborated by other testimony.
There is no dispute about the long history of the relationship between Schlesinger and his family and the Shushan firm in general and Herzog in particular from which grew the obligation to warn Schlesinger of what any attorney in such a situation would recognize as an obvious danger.
Schlesinger's testimony on the question of damages is also corroborated by other evidence.
Therefore, to the extent that Schlesinger's testimony may have contained inconsistencies they are immaterial and do not bear upon those issues which determine Schlesinger's right to recovery.
It is highly unlikely that anyone would fault Herzog or his firm had they advised all parties to reduce their complete agreement *714 to writing even though this would have been more to the benefit of Schlesinger than Lassen.

X. PLAINTIFF'S CLAIM IS NOT BARRED BY RES JUDICATA
Defendants contend that plaintiff's claim is barred by res judicata through the federal doctrine of preclusion:
Succinctly stated, if a set of facts gives rise to a claim based on both state and federal law, and the plaintiff brings the action in federal court which had "pendent" jurisdiction to hear the state cause of action, but the plaintiff fails or refuses to assert his state law claim, res judicata prevents him from subsequently asserting the state claim in a state court action, unless the federal court clearly would not have had jurisdiction to entertain the omitted state claim, or, having jurisdiction, clearly would have declined to exercise it as a matter of discretion.
Reeder v. Succession of Palmer, 623 So.2d 1268, 1272 (La.1993).
Plaintiff counters that the federal court excluded, excepted and exempted this state court action from the federal proceedings which constitutes an exception to the doctrine of preclusion.
When a state court is required to determine the preclusive effects of a judgment rendered by a federal court exercising federal question jurisdiction, it is the federal law of res judicata that must be applied. Id. The aim of claim preclusion is to prevent the existence of separate federal and state systems to serve as a vehicle to have what would be tantamount to two bites of the same apple. Otherwise, courts would be faced with multiple suits on identical entitlements between the same parties, accompanied, as they would be, by a redetermination of identical issues of duty and breach.
Plaintiff argues that the judge in the federal court proceeding specifically excepted and exempted the malpractice claims that are the subject of these proceedings from the effect of the federal court securities litigation.
Plaintiff included claims against Herzog in his original federal court complaint. It is undisputed that on January 15, 1990 plaintiff filed a Superseding Complaint amending his original petition withdrawing the allegations of attorney malpractice and breach of fiduciary duty that are among those included in the instant suit.
Subsequently, the federal court found that:
Even though the malpractice cause of action arose from the same transaction as the federal securities violation claims alleged in the federal suit, attorney conduct is an area "deeply rooted" in state interest.
In rejecting defendants' assertion that plaintiff's state court proceedings should be removed to federal court, the federal court ruled that:
The primary issue is the breach of fiduciary duty and the "fact that one aspect of the conduct constituting the breach also happens to violate federal law is not enough to make the case removable." Wolgin v. State Mut. Investors, 442 F.Supp. 974, 977 (E.D.Pa.1977). A claim alleging breach of fiduciary duty is "plainly state-related...," and state court is the proper forum. [Emphasis added.]
The federal court drew the further distinction that:
Although the factual allegation arose from the same transaction, Schlesinger's state petition is not a verbatim copy of the federal or pendent state law claims found in the federal complaint. In fact, Schlesinger's allegation regarding Herzog's handling of his banking negotiations is not included in the federal complaint. Again, Schlesinger's malpractice claims are consistently based on state law. [Emphasis added.]
Defendants contend that the federal court did not have jurisdiction to exempt plaintiff's state court claims from the res judicata effects of the preclusion doctrine because prior to the federal court pronouncements upon which plaintiff bases it claim of exemption, plaintiff withdrew those claims from the consideration of the federal proceedings by virtue of its Superseding Complaint.
*715 This argument fails to take into account the fact that by minute entry dated March 7, 1991[1], the federal court ruled that:
Because plaintiff did not comply with the requirements of Rule 15 when he filed the Superseding Complaint on January 15, 1991, the court finds it is with out legal effect.
In the minute entry of March 11, 1991 the federal court found that:
As noted above, Schlesinger has the right to choose his forum, and the court finds that Herzog will not be unduly prejudiced by defending state-law claims in state court and federal claims in federal court. [Emphasis added.]
The instant state court claim is not barred because it has already been decided in the federal court. In its opinion on the merits the federal district court noted:
... [T]he issue of the quality of Herzog's legal representation of Schlesinger is not before this court, and nothing in this opinion should be interpreted to bear on that pending state court litigation.
The federal court went beyond a mere finding that plaintiff's attorney/client claim was state in nature. The federal court clearly indicated that it felt that state court was the proper forum for these claims; and that it was not only aware of these separate state court proceedings, but implicitly approved of them when it found that "... Herzog will not be unduly prejudiced by defending state-law claims in state court and federal claims in federal court."
"Pendent jurisdiction is a doctrine of discretion which allows the trial court a wide latitude of choice in deciding whether to exercise that judicial power. See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). A federal court must consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state law claims. When the balance of these factors indicates that a case properly belongs in state court, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."
Reeder v. Succession of Palmer, 623 So.2d 1268, 1273 (La.1993).
Applying these standards to the pronouncements of the federal court, we find that court concluded these proceedings belong in state court and after weighing the factors of convenience and fairness found that Herzog would suffer no undue hardship by being required to defend these state court proceedings. Therefore, we find that it was clear or at least highly probable that the federal court did not intend that res judicata bar the instant state court proceedings. Reeder, 623 So.2d at 1275.

XI. THE JURY FINDING THAT THE SHUSHAN FIRM WAS INDEPENDENTLY NEGLIGENT WAS MANIFESTLY ERRONEOUS.
The record will not support a finding that Schlesinger was damaged by acts of malpractice committed by the Shushan firm independent of those committed by Herzog. The plaintiff failed to show by a preponderance of the evidence that anyone in the Shushan firm other than Herzog was aware of the merger until after it was completed. Louis Shushan testified that he was unaware of the merger until he read in the newspaper that it had taken place. Schlesinger introduced no evidence to the contrary. Therefore, the finding that the Shushan firm's independent acts of malpractice were 15% at fault for causing Schlesinger's damages is reversed, leaving Herzog as the only party directly at fault for Schlesinger's damages as we find no error in the jury's finding that Schlesinger was not contributorily negligent.

XII. THE REFUSAL OF THE TRIAL COURT TO TAX COSTS AGAINST THE DEFENDANTS WAS NOT ERROR.
The plaintiff appeals the decision of the trial court not to tax costs against the *716 defendants. The trial court did so without a hearing. Plaintiff assigns as error the failure to conduct such a hearing. There is no requirement that the trial court hold such a hearing.
The trial court has the discretion to deny costs to the prevailing party. Smith v. Two R Drilling Co., Inc., 606 So.2d 804, 816 (La.App. 4 Cir.1992), writ denied 607 So.2d 560 (La.1992); LSA-C.C.P. art. 1920. We find no abuse of that discretion in the instant case.

DECREE
For the foregoing reasons the judgment of the trial court is amended only to the extent that it assigns any direct fault to the firm Shushan, Meyer, and McPherson. All direct fault should be assigned to Mitchell Herzog. The decree of the trial court judgment is affirmed as amended.
AFFIRMED AS AMENDED.
BARRY, J., concurs with reasons.
BARRY, Judge concurring.
The Louisiana Supreme Court has noted the following exceptions when discussing whether a state court claim is barred by the federal doctrine of res judicata. The exceptions are: (1) the parties have agreed that plaintiff may split his claim or the defendant has acquiesced; (2) the court in the first action expressly reserved plaintiff's right to maintain the second action; (3) there are restrictions on the subject matter jurisdiction of the court; (4) the judgment in the first action was inconsistent with the fair and equitable implementation of a statutory scheme; (5) for policy reasons; and (6) it is clearly and convincingly shown that the policies which favor inclusion of a second action are overcome for some extraordinary reason. Terrebonne Fuel & Lube, Inc. v. Placid Refining Company, 95-C-0654 c/w 95-C-0671 (La. 1/16/96), 666 So.2d 624, 632, citing Restatement (Second) of Judgments, § 26 (1982), at 233-234. Schlesinger argues that the federal district court reserved his right to maintain the state court legal malpractice action. I agree.
The federal district court stated that the alleged legal malpractice by Herzog was not before the court and "nothing in this opinion should be interpreted to bear on that pending state court litigation." (emphasis added). Clearly, the federal court declined to exercise pendent jurisdiction over Schlesinger's state-rooted legal malpractice claim. The doctrine of res judicata did not bar Schlesinger's state court proceeding.
I agree that the Shushan, Meyer and McPherson law firm is not liable for the independent actions of Mitchell Herzog.
NOTES
[1] This minute entry and the minute entry of March 11, 1991 were not in the record below. We take judicial notice of their content following the precedent set in Gibson v. Barnes, 597 So.2d 176 (La.App. 1 Cir.1992).